## Clark et al., Appellants, *v.* Wright et al.

Argued January 31, 1933. Before KEPHART, SCHAF-
FER, MAXEY, DREW and LINN, JJ.

*Clark D. Beggs,* for appellant.—The lessee had the
right to decide when gas was to be taken: McKnight v.
Gas Co., 146 Pa. 185; Young v. Forest Oil Co., 194 Pa.
243; Summerville v. Gas Co., 207 Pa. 334, 338.

The lessee was not required to produce gas in market-
able quantities or in paying quantities, nor to maintain
a well at a stipulated rock pressure: Addleman v. Gas
Co., 255 Pa. 580, 587.

Lessees were under no duty to keep gas flowing: Sum-
merville v. Gas Co., 207 Pa. 334.

*John G. Frazer,* with him *H. Parker Sharp* and *Reed,
Smith, Shaw & McClay,* for appellees.—By reason of the
failure of appellants to produce gas from the well and to
pay rentals, the lease became a lease at will and was
terminated by the notice given by the landowners: Cas-
sell v. Crothers, 193 Pa. 359; Kahm v. Gas Co., 122 Kan.
786; Wilbur v. United States, 54 Fed. (2d) 437.

OPINION BY MR. JUSTICE KEPHART, March 20, 1933:

Appellants are assignees of an oil and gas lease on property in Allegheny County, made in 1911 by Homer Wright, the father of two of appellees, W. Howard and Mary R. Wright. The lease was "for the term of three years [and so long thereafter as oil or gas is produced from the land leased, and royalty and rentals paid by lessee therefor]." It was further provided therein that the lessee was to deliver to the lessor in pipe line one-quarter of all petroleum produced from the premises "and to pay $300 per annum for each gas well from which the gas is marketed, payable quarterly in advance from the date, and while the same is so utilized."

In 1911, a gas well was drilled and operated by appellants or their assignors until 1925, at which time the pressure became so low that the gas would not flow into the trunk or service lines in the vicinity without the aid of a compressor. Appellants then sold the gas to a compressor plant, and gas was produced until March 19, 1927, when the compressor company ceased to operate. Appellants then shut in the gas well by a gate valve and disconnected it from the trunk or service line or the line of the consuming company. The rental required by the lease was thereafter paid in advance up to and including March 19, 1928. Since that time payment of rent has ceased; none has been made or tendered by anyone claiming under the lease.

On January 17, 1930, the owners of the land notified all persons interested under the 1911 lease that, because of the default for 22 months in payment of the gas rentals and the abandonment of the leased premises, their rights thereunder were terminated. "No trespassing" signs were erected on the premises. The owners, on January 20, 1930, executed to Frank W. Jarvis, another of the appellees herein, an oil and gas lease [which was subsequently assigned] covering the property formerly subject to the 1911 lease. Jarvis constructed a compressor on his own land adjoining the leased property, con-

nected the Wright well thereto, and operated it together with a gas well on his own land, commingling the gas from both wells.

Appellants in April, 1932, sought to enjoin appellees from interfering with their alleged leasehold estate in the gas lands, and to compel the disclosure of and the accounting for the amount of gas produced by appellees from the premises. The court below, in dismissing their bill, held that the extension clause of the lease created a leasehold estate of an uncertain period, but that the date of termination was capable of being made certain, i. e., when oil or gas was no longer produced; and when that date became fixed, the lessee, if he had not surrendered the premises, was a tenant at will; that the notice terminated the tenancy at will, and the lease to appellees was proper.

It is apparent from a consideration of our cases that the basis of lessor's remuneration is the controlling factor in the construction of these clauses or ones of similar nature. Where a lessor's compensation is subject to the volume of production, the period of active production of oil or gas is the measure of the duration of the lease. Where lessor's compensation is a definite and fixed amount unrelated to the volume of production, the duration of the lease is not measured by the length of time the mineral is actually extracted and marketed; but by the time during which the lease provides that the lessor shall receive the fixed rental. Under these latter circumstances, it can make no difference to lessor whether 100 or 1,000,000 cubic feet of gas is produced.

Two leading cases in this State illustrate these rules. In Cassell v. Crothers, 193 Pa. 359, the clause under consideration reads: "as long thereafter as oil or gas is found in the land described in paying quantities." The remuneration which the lessor was to obtain for the use of his land was on a royalty basis and not on a flat rental basis as in the present case. This court sustained the language of the court below in that case, where it

stated, with care, the importance of the nature of the compensation in reaching its conclusion: "Adopting a rule, then, that will do equity to both parties, we hold that in an oil lease for a fixed period and 'as long thereafter as oil is found in paying quantities,' *where the lessor's compensation is one-eighth of the oil produced,* the tenancy as to the surface of the land, after the expiration of the fixed period, and after the fact that oil is not being found and produced in paying quantities becomes susceptible of proof, is a tenancy in the nature of a tenancy at will, and if not actually terminated by mutual consent, or continued by mutual consent in order that further exploration be made, may be terminated by either party."

To have held otherwise, or in any royalty case where production has ceased, would be most inequitable because the value of the lease to the lessor is thereby made destructible at the will of the lessee.

The other case [one that appellants contend rules the present lease], and typical of the second rule as to compensation, is that of Summerville v. Apollo Gas Co., 207 Pa. 334, wherein, under the terms of the lease, the lessee had the right to hold the premises "for and during the term of two years......and as much longer as oil and gas are found in paying quantities, or the hereinafter described rental is paid." The lessee failed to market any gas during the extended period, but retained it in the well, although the evidence indicated the well would produce one million feet per day. The lower court instructed the jury to bring in a verdict for the defendant on the ground that gas was found in paying quantities. This court affirmed the judgment below, and in its opinion stated that it may be that for sometime the lessee was not able to find a purchaser for the gas, "but that was not the affair of the lessors; that they are not interested in the proceeds of the sale of the gas. Their rights under the agreement extended only to the receipt of a stipulated annual rental for each well."

The lease, now under consideration, provides that the lessee is "to pay $300 per annum for each gas well from which the gas is marketed, payable quarterly in advance from the date, and while the same is so utilized." This qualification concerning marketing, and the provision "while the same is so utilized," appear to have been inserted for the protection of the lessee, and not to burden him with the necessity of actually marketing the gas, with the result that [although the court below be correct in interpretating the reference to rentals in the extension clause as a condition which if broken would constitute a forfeiture] this rental clause expressly provides for an exception releasing the lessee from making rent payments for any well the gas from which is not marketed. This being so, the value of the lease to the lessor is made dependent upon the marketing of the gas just as certainly as in the royalty basis cases. It thus falls within the first class of cases where the compensation to the lessor is on a royalty basis, and the rule of construction in the Cassell Case, supra, is applicable.

A case similar to the one at bar is Kahm v. Arkansas River Gas Co., 182 Kan. 786, where the court cancelled a lease containing a provision such as is here involved, under a similar state of facts, the only major distinction being that the consideration for the lease is expressed on a royalty basis, but this is a distinction without a difference, for the reason indicated above. In Union Gas & Oil Co. v. Adkins, 278 Fed. 854, the court at page 857 stated: "It is contended on the part of the appellant that the question whether oil or gas is produced in paying quantities is one solely for the determination of the lessee. There is some force in this contention in so far as it applies to a gas lease where the contract provides that the lessor shall receive a fixed annual rental for each gas well and the lessee is ready and willing to pay that rental. In such case the landowner receives the same revenue from the operation of his land as he would receive if the gas well were in fact a paying one to the

lessee, but no such rule can obtain in reference to an oil well, where the lease provides that the sole profit arising to the owner of the land from such operation shall consist of a part of the oil produced and marketed from the premises."

Other cases of similar import are: Wilbur v. United States, 54 F. [2d] 437; United States v. Brown, 15 F. [2d] 565.; American Window Glass Co. v. Williams, 30 Ind. App. 685; Bundy v. Ahrens, 115 Kan. 818; Tedrow v. Shaffer, 23 Oh. App. 343.

Appellants also rely on McCutcheon v. Oil Co., 102 W. Va. 354, where, under a lease for ten years and as long thereafter as oil or gas, or either of them, is produced, a gas well was drilled but no oil ever sold. The gas was held in the well for nine years, rentals were in default for four years. The claim was made that gas was not produced until it was marketed, but the court construed the clause otherwise, the lessor being interested only in receiving a flat yearly rental. It does not appear that there was any clause releasing the lessee from paying rental if gas was not marketed.

However, McGraw v. Kennedy, 65 W. Va. 595, cited by appellants, involved the extension clause: "so long thereafter as oil or gas, or either of them, is produced therefrom," and also a provision similiar to that in the instant case by which the lessees were obligated to pay $200 yearly for each gas well "the product from which is marketed and used off the premises." The court held that this was not a stipulation to market or give up, but was for the lessees' protection. It is important to note that the rental had been paid although no gas had in fact been marketed, and the court held this clause had been waived by the lessee as the result of such payment, with the result that the latter clause did not remove this case from the flat rental basis classification into that of the royalty basis.

It is apparent that the construction given the lease by the court below could well be sustained as decided in the

Cassell Case, supra, where the tenancy of appellants was held to be one at will, and under that decision the lessors here acted within their rights when they terminated the lease and subsequently leased the premises to appellees.

Although the foregoing discussion disposes of the appeal, there are other reasons for the dismissal of the bill. In effect, the conclusion reached above is that the facts disclose such a relinquishment of the rights of property by the lessees to their lessors under a lease wherein the rental depends on the volume of production, as is tantamount in law to an offer of surrender of the leasehold rights, which to be effective must be accepted by the lessors: Ralph v. Deiley, 293 Pa. 90. Under a lease of this character appellants' acts show an intent to surrender. This intent was effectuated by withdrawal from the premises. The failure of appellants' market is not a sufficient explanation of their withdrawal, for it appears that there was a market for the gas had they been willing to expend a reasonable sum to procure it. It was in April, 1932, more than four years after the withdrawal and after appellees, who were willing to expend such sum, were successfully operating a compressor plant they had connected with the premises, that appellants took any action or made any effort to enforce the 1911 lease. If their contention is correct, in a lease on a production or royalty basis, no limit of time could be placed on their failure to comply with the terms of the lease. The land would be continuously subjected to a lease which brought no return to the lessors and the lessors would be without remedy to compel any. The lease would rest as a perpetual cloud on the title, gravely affecting the market value of the surface land.

The new lease to appellees operated as an acceptance of the surrender, dissolving all relations that formerly existed under the 1911 lease and neither lessors nor lessees were thereafter bound by its covenants. In Ralph v. Deiley, supra, we said:

"When the lessee quits the premises with an intention to give up all rights to them, and to disengage himself from liabilities springing from the contract of lease, to make his effort effectual he must procure the lessor's assent, or, in other words, there must be a surrender. A surrender is the yielding up of an estate for years to him who has the immediate reversion, and the effect is to pass the estate of the tenant to the landlord, extinguishing the rent reserved: Milling v. Becker, 96 Pa. 182, 185. Surrender is a contractual act, and it occurs only through the consent of both parties, evidenced by an express agreement or unequivocal act of the parties which implies that they have agreed to consider the surrender as being made: Felker v. Richardson, 32 Atl. 830, 831, 67 N. H. 509, 510...... To show it [assent to or acceptance] there must be evidence of acts so inconsistent with the terms of the first lease that the relation of landlord and tenant, established by the reletting, could not be enforced under the terms of the first lease. Such acts would indicate as a logical and reasonably necessary result that the lessor intended to accept the surrender tendered by the lessees: Whitcomb v. Brant, 90 N. J. L. 245, 100 Atl. 175."

In Jenkins v. Root, 269 Pa. 229, we said as to a lease similar to appellees':

"A lessor cannot legally execute two independent leases covering the same premises, but when the first tenant submits by relinquishing possession to the second lessee, there is a presumption in law that a surrender has been made and accepted. The landlord is then estopped from asserting any right under the first lease. The second lease, however, must be definite in terms, valid to pass an interest to the lessee......"

Surrender is a question of fact, to be determined by the acts and intentions of the parties. An unexplained cessation of operations under a lease the term of which depends on production, without remuneration to the lessor for an unreasonable length of time, gives rise to a

fair presumption of abandonment or surrender, and, standing alone and admitted, would justify the court in declaring an abandonment or a surrender as a matter of law. See Aye v. Phila. Co., 193 Pa. 451.

An oil or gas well from which no oil or gas is produced and marketed within a reasonable length of time is as no well at all to a lessor dependent upon such acts for his compensation. Under these circumstances, a conclusion of surrender is an equitable one. See Soaper v. King, 167 Ky. 121; Monarch Oil & Gas Co. v. Hunt, 193 Ky. 315.

Decree affirmed, costs to be paid by appellants.